# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Apple, Inc., One Apple Park Way, Cupertino, California ) Case No.  '25 MJ2643
95014 / Jonathan Bonyhard, 831-713-8811, DS ID )
16747277054, muskratface@icloud.com )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the   Northern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 952 and 960 | Importation of a Controlled Substance |
| 21 USC Sec. 963 | Conspiracy to Import |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ian MacLean, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
  telephone   *(specify reliable electronic means)*.

Date:  May 15, 2025

*Judge's signature*

City and state:  San Diego, California       Hon. Steve B. Chu, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Ian MacLean, being duly sworn, hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is in support of an application by the United States of America for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple Inc. ("Apple") to disclose to the government records and other information, including all Apple iCloud electronically stored digital files, including deleted files, and the contents of communications associated with:

>   Jonathan Bodine BONYHARD
>   Telephone Number: 831-713-8811
>   DS ID: 16747277054
>   Email Address muskratface@icloud.com

("**Target Account**"), that are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, California 95014. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B and relates to the investigation of Jonathan Bodine BONYHARD for importing from Mexico and distributing within the United States multi-kilogram quantities of methamphetamine, as well as conspiracy to do so, in violation of Title 21, United States Code, Sections 952. 960, and 963.

2.      I have been employed as a Special Agent with Homeland Security Investigations (HSI) since March of 2020. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

3.      During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational

habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. Through my training and experience I have also gained a working knowledge of the operational habits of transportation and distribution methods used by narcotics traffickers once inside the United States.

4. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry, Otay Mesa Port of Entry, and Tecate Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States. And traffickers may continue to communicate with the transporter(s) to provide instructions regarding transportation of currency which is often exchanged for the narcotics.

5. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug trafficking organizations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in the affidavit. This affidavit is intended to show simply that there

is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 21, United States Code Sections 952, 960, and 963 as described in Attachment B.

## JURISDICTION

7. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FACTS SUPPORTING PROBABLE CAUSE

8. On February 26, 2025, at approximately 2:36 AM, Jonathan Bodine BONYHARD, ("BONYHARD"), a United States citizen, applied for entry into the United States from Mexico through the San Ysidro POE in vehicle lane #29. BONYHARD was the driver, sole occupant, and registered owner of a 2019 Honda Civic ("the vehicle") bearing California license plates.

9. A Canine Enforcement Team was conducting pre-primary operations when the Human and Narcotic Detection Dog alerted to the rear bumper of the vehicle. The Canine Enforcement Officer observed multiple non-factory oxidized bolts in the rear bumper area of the vehicle. An Anti-Terrorism-Contraband Enforcement Team Officer also observed black tape in the rear bumper of the vehicle. The vehicle was referred to secondary inspection.

10. During inspection of the vehicle, Customs and Border Protection Officers (CBPO) discovered 109 packages containing a white crunchy substance. These packages were concealed in the front bumper, rear bumper, rear hatch, and passenger-side quarter panel of the vehicle, with a total approximate weight of 69.92 kgs (153.82 lbs). A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.

11. BONYHARD was placed under arrest at approximately 4:37 am.

12. During a post-Miranda interview, BONYHARD denied knowledge that the narcotics were in the vehicle. BONYHARD stated that he was returning home after visiting his girlfriend in Mexico and going to the casino on the evening of February 25, 2025. BONYHARD stated that a possible relative of his girlfriend, whom he knows only as "Chino" or "Primo," may be responsible for the narcotics in the vehicle. BONYHARD said "Chino" makes a living with narcotics activities. BONYHARD stated that "Chino" has asked him to cross narcotics in the past, but he refused. BONYHARD stated he did not see "Chino" when he crossed into Mexico on February 25, 2025. BONYHARD stated he was not being paid to bring anything into the United States and that nobody asked him to bring anything into the United States. BONYHARD admitted that it is his responsibility to know what is in his car.

13. BONYHARD was arrested and charged with a violation of Title 21, United States Code, 952 and 960, importation of a controlled substance.

14. A white iPhone and silver iPad were found and seized by a CBPO who was tasked to perform a secondary inspection of the vehicle and inventory all the property seized from the Defendant and his vehicle. The white iPhone was found by the CBPO in the center console of the vehicle. The silver iPad was found by a CBPO on the floor of the vehicle behind the driver's seat. During the interview, Defendant was shown the white iPhone and identified the white iPhone was belonging to him.

15. On February 28, 2025, Homeland Security Investigations Special Agent Ian MacLean sought and obtained search warrants for the defendant's white iPhone and silver iPad.[1]

16. On February 27, 2025, the Computer Forensics Group advised that due to the security features on the devices, it would be unlikely to recover data from the devices. On or about March 12, 2025, law enforcement requested that Apple preserve the iCloud data associated with the **Target Account**. On March 13, 2025, Apple confirmed receipt of the

---

[1] Both search warrants were signed by the Honorable Jill Burkhardt, Magistrate Judge in case numbers 25MJ00026-JLB and 25MJ00939-JLB, respectively.

preservation request for the **Target Account**. On March 21, 2025, Special Agent MacLean was notified by a member of the Computer Forensics Group that the white iPhone had data erased by the user and only a sim card extraction could be completed on the silver iPad.

### Identifying Information for the Target Account

17. Biographical information provided by BONYHARD led to identification of the name and phone number attributable to the **Target Account**. An administrative subpoena submitted to Apple led to the identification of the DS ID and email address attributable to the **Target Account**.

18. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that the **Target Account** is being used to coordinate and facilitate the importation of controlled substances within the United States. Unless disabled by a sophisticated user, iCloud accounts are automatically created and information automatically backed up. If the user of the account is using an Apple device like an iPhone (like here), device information will be automatically backed up to their iCloud account. In my training and experience, drug traffickers commonly use cellphones in furtherance of their activities because, among other reasons:

   a. Cellphones are mobile and permit instant access to phone calls, text messages, web pages, and voice messages;
   b. Cellphones permit real-time, active monitoring of controlled substances while they are in transit;
   c. Cellphones can be used to easily communicate, arrange, and synchronize the times and locations for pick up and drop off of controlled substances;
   d. Cellphones can be used to communicate using encrypted messaging applications so as to hinder law enforcement monitoring.

Given that Apple confirmed that available data for the **Target Account** was being preserved, it is likely that the subscriber or user of the **Target Account** utilizes the iCloud file hosting service to backup data from his Apple cellphones. As described in the

paragraphs below, the iCloud service can be used to backup and store data from iOS devices, third-party applications, photos, videos, documents, and other electronic data.

19. Subscriber and/or user information, including: all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, and transactional data will lead to the identification of co-conspirators and other evidence of drug importation and distribution. Such information is likely to be stored in the **Target Account**. I further believe that evidence of drug trafficking (such as text messages, photos, videos, locations, and contacts) may be stored in the **Target Account**. In my training and experience, narcotics traffickers may be involved in the planning and coordination of drug importation and distribution events in the days and weeks prior to such an event. Given the circumstances surrounding BONYHARD's arrest at the San Ysidro, California Port of Entry on February 26, 2025, I am requesting account data for the **Target Account** for the period **between February 12, 2025, up to and including February 26, 2025**.

20. Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

**INFORMATION REGARDING APPLE ID AND iCLOUD**

21. Apple is a United States company (an Internet Service Provider, or "ISP") that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

22. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.      iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

23. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

24. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

25. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol

address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

26. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

27. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

28. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My

Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

29. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

30. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

31. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who

used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

32. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

33. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

34. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION**

35. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section II of Attachment B. Upon receipt of the information described in

Section II of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

36. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISP's personnel are not. It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises. The impact on its business would be disruptive and severe.

37. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the **Target Account**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

38. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword

searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

39. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

40. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the **Target Account** and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

41. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

42. Other than as described above, I am not aware of any other attempts by law enforcement to obtain this data sought through the requested warrant by other means.

**CONCLUSION**

43. Based on the foregoing, I request that the Court issue the proposed search warrant.

44.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Ian MacLean
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 15th day of May 2025.

_____
HON. STEVE B. CHU
United States Magistrate Judge

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

This warrant applies to information associated with

>Jonathan Bodine BONYHARD
>Telephone Number: 831-713-8811
>DS ID: 16747277054
>Email Address muskratface@icloud.com

("**Target Account**") that is stored at premises owned, maintained, controlled or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

PARTICULAR THINGS TO BE SEIZED

I.  **Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

  a. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);
  b. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");
  c. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated

      with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

  d. The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

  e. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

  f. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and capability query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My and AirTag logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

  g. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with AirTags, Location Services, Find My, and Apple Maps;

  h. All records pertaining to the types of service used;

  i. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

  j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

II. **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of Title 21 U.S.C. §§ 952, 960, and 963 (importation of controlled substances and conspiracy to import controlled substances) (collectively referred to as the "Target Offenses"), those violations involving Johnathan Bodine BONYHARD from **February 12, 2025 up to and including February 26, 2025**, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a. Information that constitutes evidence of the identification or location of the user(s) of the **Target Account**;
b. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) in the commission of the Target Offenses under investigation; or (ii) communicated with the **Target Account** about matters relating to the Target Offenses under investigation, including records that help reveal their whereabouts;
c. Information concerning how and when **Target Account** was accessed or used, to determine the time, data, and location of account access, use, and events relating to the Target Offenses under investigation and to the Account user;
d. Information that constitutes evidence concerning drug trafficking;
e. Communications between BONYHARD and other co-conspirators involved in the Target Offenses;
f. The identity, location, and travel of any co-conspirators involved in the Target Offenses, as well as any such co-conspirators' acts taken in furtherance of the Target Offenses listed above;
g. Evidence of who used, owned, or controlled the equipment used to access or modify the **Target Account**, including phones and computers;
h. Evidence of the times the equipment used to access or modify the **Target Account** was used, and which device(s) were used to access or modify the **Target Account**;

i. Passwords, encryption keys, and other access devices that may be necessary to access the **Target Account** and the equipment used to access or modify the **Target Account**;
j. Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; Evidence indicating the account owner's state of mind as it relates to the crime under investigation;
k. The identity of the person(s) who created or used the **Target Account**, including records that help reveal the whereabouts of such person(s); and
l. Any records pertaining to the means and source of payment for services (including any credit card information or bank account number or digital money transfer account information).